## AFFIDAVIT

I, Lisa Rudnicki, having been duly sworn, on oath depose and state that:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since February, 1996. In that capacity, I investigate violations of the federal firearms statutes and have participated in multiple investigations relating to the unlawful possession of firearms.

2. Based on my training and experience, I am aware that Title 18, United States Code, Section 922(g)(1) makes it a federal offense for any individual who has previously been convicted of a felony offense to possess a firearm or ammunition in or affecting interstate commerce. Having so stated, I make this affidavit in support of a complaint charging **DARYLE SMITH, a/k/a "CLOCKMASTER,"** with being a felon in possession of a firearm and ammunition in violation of that statute.

3. The statements contained in this affidavit are based on my own investigation, work done by other ATF Agents, and on information provided to me by officers of the Watertown Police Department ("WPD"). This affidavit is submitted for the limited purpose of establishing probable cause to believe **SMITH** violated 18 U.S.C. §922(g)(1), and therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

4. Some time after 9:35 p.m. on December 15, 2012, Watertown Police Officer Robert Kelly responded to 14 Essex Street in Watertown in response to a call regarding an incident in which a male allegedly displayed a gun. On arrival, Kelly spoke to several witnesses on scene and was advised that, earlier that day, Elisabeth Singleman had come to 14 Essex Street to speak with Michael Morrisey, her former boyfriend, who lives at this address. Singleman and Morrisey argued about money that Singleman alleged that Morrisey owed her. Singleman reportedly left without receiving any money but stated her intent to return with "friends" to collect what she said she was owed.

5. Officer Kelly was also advised that, at approximately 9:35 p.m., Singleman returned to Essex Street in a gray sedan as promised with a black male passenger. The witnesses advised that Singleman got out of the car alone and met Morrisey on the front walk of 14 Essex Street where they resumed their argument.

6. According to the witnesses, the discussion between Singleman and Morrisey got quite loud and ended only when Morrisey gave Singleman some of the money she claimed to be owed.

7. Once Singleman was paid, she was reported to have walked back to the gray car (where her passenger was waiting), got in, and started to drive away. As she did so,

the witnesses saw that the passenger (described as a large black male who one witness knew by the street name of "CLOCKMASTER" and thought was from Boston) stuck his arm out the window holding a small firearm in his hand.

8. After Officer Kelly was advised of this second incident, a police area broadcast was put out regarding the gray car and its passenger and officers searched the area as well. Those efforts were unsuccessful and neither the car nor its occupants were located.

9. Later that evening, Officer Kelly called District D-4 of the Boston Police Department in an effort to identify the male passenger described to him as "CLOCKMASTER." In response, Officer Kelly learned that Boston resident **DARYLE SMITH** went by the name CLOCKMASTER and had an extensive criminal record that would have precluded him from owning or possessing a firearm.

10. At 3:50 a.m. on December 16, the Watertown Police received a report that the same male and female (later determined to be Singleman and **SMITH**) had returned to 14 Essex Street. The first responder to that call was Watertown Police Officer Brandon O'Neill who had been made aware of the incident at this address the previous night and that the individual who had reportedly flashed a gun had been had a criminal record that included offenses for drugs and assault and battery with dangerous weapons charges. As Officer O'Neill approached the area of 14 Essex Street, he

was advised by Patrol Supervisor Sgt. John MacLellan that, for officer safety purposes, the call should be treated as a felony stop based on the prior report that this male was in possession of a gun.

11. Upon arrival, Officer O'Neill saw a gray car parked outside 14 Essex Street and noted a couple (later determined to be **SMITH** and Singleman) walking towards the car from a trash container located near the property line of an adjacent gas station. Singleman quickly got behind the wheel of the gray sedan and **SMITH** got into the passenger seat.

12. Officer O'Neill immediately activated his emergency lights and both **SMITH** and Singleman got out of their car. Using his loudspeaker, Officer O'Neill (who as set forth above was the first officer on the scene and was alone in his cruiser), ordered both **SMITH** and Singleman to go to the rear of the car and place their hands on their heads (which they did).

13. As this was taking place, other cars arrived at the scene including Sgt. MacLellan and Officers Kelly and Welch. **SMITH** and Singleman were then separated and **SMITH** was promptly patfrisked for officer safety.

14. During the patfrisk of **SMITH**, Sgt. MacLellan felt a bag of what he had immediately identified as ammunition in **SMITH**'s left pant pocket and removed it. In response to

questions from Sgt. MacLellan, **SMITH** denied he had a gun and stated that he had the ammunition because he "was taking care of business" with respect to Singleman's ex-boyfriend, who had reportedly told Singleman to come pick up some food. As he continued to speak, **SMITH** became belligerent about the way Singleman had been treated and said he was "going to put [his] foot up [the ex-boyfriend's] ass."

    15.  Officer Welch subsequently located a firearm under the same trash container where Officer O'Neill had first seen **SMITH** and Singleman when he arrived.  **SMITH** and Singleman were immediately placed under arrest and given their <u>Miranda</u> rights by Officer O'Neil.  **SMITH** interrupted Officer O'Neill as he attempted to do so (telling the Officer that he, **SMITH,** understood his rights) and, when Officer O'Neill finished and asked **SMITH** if he understood his rights, **SMITH** reiterated that he did and told Officer O'Neill that "you just saved somebody's life."

    16.  The firearm found underneath the trash container by Officer Welch is a High Standard MK IV .22 Magnum revolver bearing serial number S26557 ("the charged firearm").  At the time it was recovered, the charged firearm contained 9 rounds of .22 ammunition all marked with the headstamp "C."

    17.  The bag of bullets recovered from **SMITH**'s pocket were also .22 caliber.  Those 28 rounds also contained

headstamps identical to that found on all of the ammunition recovered from the charged firearm.[1]

18. After the charged firearm and ammunition were recovered, they were inspected by ATF S/A Mattheu Kelsch, who is trained to perform interstate commerce nexus examinations. S/A Kelsch examined the High Standard MK IV .22 Magnum revolver and all of the recovered ammunition (including that found in the gun and the additional ammunition found in **SMITH's** pocket), confirmed that they were a "firearm" and "ammunition" for purposes of federal law, and determined that both the firearm and all of the ammunition had been manufactured outside Massachusetts, meaning that they had traveled across state lines or international boundaries prior to being seized in Dorchester on December 16, 2012.

19. I have reviewed **SMITH**'S criminal record as maintained by the Massachusetts Criminal History Systems Board. It reveals, among other things, that **SMITH** was convicted in 1989 in Suffolk Superior Court on charges of Armed Robbery and Aggravated Rape. Based on my training and experience, I know that these are crimes punishable under Massachusetts law by imprisonment for more than one year.

---

[1] Of the 28 rounds contained in the bag, 26 are .22 caliber LR (long rifle) "C" brand matching those of the 9 rounds in the firearm. The remaining 2 rounds are .22 magnum caliber "C" brand. All 28 rounds were compatible with the charged firearm.

20. Based on the foregoing, I submit that there is probable cause to believe that, on or about December 16, 2012, **DARYLE SMITH, a/k/a "CLOCKMASTER,"** having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did possess, in and affecting commerce, a firearm and ammunition in violation of Title 18, United States Code, Section 922(g)(1).

LISA RUDNICKI
Special Agent, ATF

JAN 1 4 2013

Sworn and subscribed to before me this __ day of January, 2013.

ROBERT B. COLLINGS
U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS